UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MICHELLE SMITH, | ) | 1:09cv01088 DLB |
| | ) | |
| | ) | |
| Plaintiff, | ) ) | ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) ) | |
| | ) | |
| Defendant. | ) ) | |

**BACKGROUND**

Plaintiff Michelle Smith ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income pursuant to Title XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.

**FACTS AND PRIOR PROCEEDINGS[1]**

Plaintiff filed her application on August 2, 2007, alleging disability since March 8, 2001, due to depression and post-traumatic stress disorder ("PTSD"). AR 138-143, 147-153. After Plaintiff's application was denied initially and on reconsideration, she requested a hearing before

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1

an Administrative Law Judge ("ALJ").  AR 92-92, 101-105, 106-107.  On November 21, 2008, ALJ Stephen Webster held a hearing.  AR 21-52.  He denied benefits on March 9, 2009.  AR 7-20.  The Appeals Council denied review on May 20, 2009.  AR 1-3.

       Hearing Testimony

       ALJ Webster held a hearing on November 21, 2008, in Fresno, California.  Plaintiff appeared with her attorney, Melissa Proudian.  Vocational expert ("VE") Jose Chaparro also appeared and testified.  AR 21.

       Plaintiff testified that she was born in 1988.  She was 5 feet, 4 inches tall and weighed 149 pounds.  AR 24.  Plaintiff has a one year old son and lives with him in an apartment.  AR 25.  She is not married.  AR 24.  She has never had a driver's license and either walks or relies on her grandmother for transportation.  Plaintiff is able to take care of all her personal needs.  AR 25.  She is also able to cook, clean, do laundry and shop.  Plaintiff takes care of her son most of the time, but sometimes needs help.  AR 26.

       Plaintiff watches televison "most of the time" when she isn't taking care of her responsibilities.  She also spends about an hour every two weeks reading and at least two hours a day on the computer.  AR 26-27.  Plaintiff has no friends and visits with family occasionally.  She is not able to attend church.  AR 27.

       Plaintiff finished 11 years of school and has not received her GED.  AR 27.  During high school, she took both regular classes and special education classes.  AR 29.  She previously received benefits from March 2001 through June 2006.  Since then, she worked from May 2007 through August 2007 cleaning houses.  She has not had any other job.  AR 28, 32.

       Plaintiff testified that she has problems with her kidneys and suffers from depression and PTSD.  She receives treatment for her kidneys once every three months.  Plaintiff also sees a mental health counselor once a week and a psychiatrist once a month.  AR 30.  The medication she receives from the psychiatrist does not help.  When she feels depressed, she wants to kill herself and doesn't care what anyone thinks.  AR 30.  She also feels sad and worthless.  AR 31.  The PTSD causes her to always be tired and not want to be "bothered with anybody."  When she is anxious, sometimes her heart hurts so bad that she can't breathe.  AR 31.

Plaintiff did not have a problem sitting, but thought she could stand for about 20 to 30 minutes because of her kidneys. AR 31. She thought that she could walk a mile and lift 20 to 30 pounds. AR 32. Plaintiff can be in small crowds but doesn't want to be in large crowds. AR 39.

When questioned by her attorney, Plaintiff testified that when she is depressed, she stays in her room and cries. This goes on for days. AR 32. She also doesn't eat and doesn't get up to brush her hair or teeth when she is depressed. Plaintiff explained that she is like this for two weeks out of the month. AR 33. Her grandmother checks on her every day and helps her take care of her son. When she is depressed, her ex-boyfriend takes care of her son because she cannot function enough to care for him. AR 32-33.

Plaintiff last tried to kill herself in August 2008 when she slit her wrist and tried to stab herself. AR 34. She was transported to the hospital by ambulance and stayed overnight at PACT. AR 34. Plaintiff was also hospitalized in April 2008 after she tried to kill herself. AR 35. She has been hospitalized at least three times over the last year and a half. AR 35. Plaintiff cuts herself about every other month because of depression. Hospitalization doesn't make her feel better, but just "contains" her until she can get out and do it again. AR 38-39.

Plaintiff explained that she cannot make herself feel better when she is depressed. She does not have any friends because her mother killed her boyfriend when she was younger and her friends turned on her. Plaintiff witnessed the killing and it now causes her anxiety. She still feels that she could have helped her mother. AR 36.

Plaintiff testified that she cannot concentrate because she's always thinking that she doesn't want to be here anymore and that life isn't worth living. She estimated that she can pay attention for two hours before having suicidal thoughts and becoming depressed. AR 36-37. She feels anxious or nervous all the time, but when it gets severe, it will last a day, or at least a couple of hours. Breathing sometimes works to relieve the anxiety. AR 37.

Plaintiff takes two medications for depression. The medications do not cause side effects but make her feel worse. She has told her doctor that the medication doesn't work and he tries a higher dose or a different medication. AR 38.

Plaintiff's grandmother, Jo Ann Williams, also testified. She last lived with Plaintiff about a year ago, but also lived with her for four months this year. AR 40. She sees Plaintiff almost every day, and she talks to her on the days she doesn't see her. AR 41. Ms. Williams usually spends all day with Plaintiff when she sees her. AR 41.

When questioned by Plaintiff's attorney, Ms. Williams testified that Plaintiff has depression and PTSD. She has also had anxiety most of her life. AR 41. Ms. Williams believes that these diagnoses affect Plaintiff's ability to function because when her depression and anxiety are "real bad," she doesn't do anything except cry and stay in a dark room. AR 42. She also gets moody and will try to harm herself. AR 43. When Plaintiff was living with her, this happened just about every day. Plaintiff had problems going to school because the depression caused her to not want to talk to people or see anyone. AR 42. Since August 2007, she estimated that Plaintiff has been depressed for about three weeks per month. AR 42.

Ms. Williams last saw Plaintiff try and hurt herself about a month and a half ago. Plaintiff was depressed and said she was tired of living. She got a kitchen knife and cut herself on the patio. Ms. Williams called police and Plaintiff was taken to the PACT unit, where she stayed overnight. AR 43.

Ms. Williams further testified that Plaintiff does not eat and does not feed her son when she is depressed. AR 43. When Plaintiff has her son, Ms. Williams calls her every day to see if she needs help. She usually goes over two or three times a week. AR 44. Ms. Williams thought that Plaintiff could not take care of her son alone, though she noted that otherwise, Plaintiff was "doing pretty good." AR 44-45.

Ms. Williams noted that therapy seems to help when Plaintiff is talking to her counselor, but she becomes depressed again when she comes home. AR 45. Not having money or a job, and not being able to care for herself and her son, triggers mood changes and depression. Plaintiff gets sad and just wants to give up because she fails at everything she tries to do. AR 45. Ms. Williams did not think Plaintiff could work eight hours a day, for five days a week, because she has difficulty concentrating and does not "process things the way normal people" do. For

example, she may take constructive criticism as a reprimand and ends up in a "messed up mood." AR 46.

For the first hypothetical, the ALJ asked the VE to assume a person of Plaintiff's age, education and work history. This person had no exertional or postural limitations, but was limited to simple, repetitive tasks. The VE testified that this person could perform medium jobs such as meat trimmer, floor waxer and kitchen helper. AR 48.

For the second hypothetical, the ALJ asked the VE to assume that this person could lift 20 pounds occasionally, 10 pounds frequently, and could sit, stand and/or walk for six out of eight hours. This person is limited to simple, repetitive tasks. The ALJ testified that this person could perform the light positions of housekeeping cleaner, car wash attendant and cafeteria attendant. AR 49.

For the third hypothetical, the ALJ asked the VE to assume a person with the same limitations as in the second hypothetical, though this person would have occasional problems maintaining attention, concentration and pace. The VE testified that this person could not perform any work. AR 49.

<u>Medical Record</u>

On November 2, 2006, Plaintiff was evaluated at the Heritage Center through Fresno County Mental Health. Plaintiff complained of being sad every day since she was seven years old and reported decreased energy, isolation, guilty feelings and loss of appetite. She also reported poor sleep and mood swings, as well as a history of four suicide attempts and five psychiatric hospitalizations. Plaintiff has panic attacks with sudden chest pains, crying spells and nervousness. Her major stress was "people not doing what they say they will do and they leave her." Plaintiff had taken Paxil, Prozac and Zoloft with no benefits. On mental status examination, Plaintiff's mood was depressed. Insight and judgment were normal and her intelligence was average. Joseph Alimasuya, M.D., diagnosed bipolar II disorder and chronic/delayed PTSD and prescribed Seroquel and Cymbalta. AR 360-361.

Plaintiff was seen at the Heritage Center on December 5, 2006. She reported that she was out of Seroquel. She also reported that she wanted to get pregnant. On mental status

examination, Plaintiff's affect was normal, as were insight and judgment. Her mood was depressed and her intelligence was average. Plaintiff was diagnosed with bipolar II disorder and chronic/delayed PTSD. She was instructed to continue Cymbalta and increase her Seroquel dose. AR 298.

On December 13, 2006, Plaintiff was assessed by the Fresno Unified School District's Department of Special Education. At that time, Plaintiff was attending Edison High School and was living with her boyfriend. Plaintiff's scores on the Wechsler Individual Achievement Test were not considered valid because she was "in a very agitated state due to her mother's illness." She declined an offer to retake the test. Testing from March 2005 showed her reading to be at a ninth grade level and her math to be at a fourth grade level. AR 217-220.

Further testing showed her visual-motor integration to be in the eighth percentile and poorly developed for her age. Her auditory-perceptual skills were in the fourth percentile, which indicates a possible processing deficit. Plaintiff showed clinically significant signs of anxiety and depression. Plaintiff's eligibility for special education services based on a specific learning disability was inconclusive, though she was eligible based on the criteria for emotional disturbance. AR 220-226.

On January 15, 2007, State Agency physician J. Duffy, M.D., completed a Mental Residual Functional Capacity Assessment. He opined that Plaintiff had moderate limitations in her ability to (1) understand, remember and carry out detailed instructions, (2) perform activities within a schedule, maintain regular attendance and be punctual, (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace, (4) get along with coworkers or peers, and (5) respond appropriately to changes in the work setting. AR 244-245.

In assessing her functional capacity. Dr. Duffy found that Plaintiff could understand, remember and carry out simple instructions, maintain concentration, persistence and pace for the

duration of a normal workday/workweek, relate appropriately to the public, peers and supervisors, and respond appropriately to usual work situations and adapt. AR 246.[2]

On January 19, 2007, Plaintiff's counselor noted that Plaintiff had not been going to school and needs assistance in making decisions. Plaintiff wanted to leave school even though she needed only a few more credits. She was not making appropriate choices for herself and was not functioning as well as in the past. AR 329.

An ultrasound of Plaintiff's kidneys performed on January 26, 2007, revealed a relatively small right kidney consistent with a mildly atrophic appearance. AR 275.

On February 15, 2007, Plaintiff told her therapist that she had not been to school since Christmas break. She continued to be in pain and felt she was not getting any better. AR 326.

Plaintiff was seen at the Heritage Center on April 25, 2007. She was three and one half months pregnant and had stopped taking Cymbalta, though she was still taking Seroquel for sleep. On mental status examination, her affect was flat and her mood was irritable. Plaintiff's insight and judgment were impaired and her intelligence was below average. Plaintiff was diagnosed with bipolar II disorder and chronic/delayed PTSD. She was instructed to stop taking the Seroquel during pregnancy. AR 286-287.

Plaintiff returned to therapy on May 7, 2007, after a break because of transportation difficulties. She reported overall improvements, with no suicidal ideation, though she rated her happiness at a four out of ten. AR 323.

On June 18, 2007, Plaintiff was discharged from therapy due to chronic non-compliance. She did not maintain appointments and did not cancel as previously discussed. AR 315.

Plaintiff returned to therapy in August 2007. She reported that things had not been going well in her relationship with her boyfriend. AR 313.

---

[2] In a Case Analysis dated January 14, 2007, Dr. Duffy noted that Plaintiff previously received benefits and was now being evaluated as an adult. He opined that "the current evidence is likely to result in a denial based on the current [consultive examiner's opinion] that [she] can perform SRT on a sustained basis. This is despite the fact that she has had to stop taking her Y meds because she is pregnant." Dr. Duffy believed that the prior file was necessary to better understand the longitudinal history of her psychological impairment and requested that it be sent to the ALJ. AR 342.

On October 5, 2007, Plaintiff saw Steven C. Swanson, Ph.D., for a psychological assessment. Plaintiff reported that she recently stopped attending Edison High School and hopes to attend adult school. She had taken psychotropic medication in the past but was not taking any currently because of her pregnancy. Plaintiff was living with her grandmother and although she worked from August to May 2007 providing in-home care, she was not currently employed. Plaintiff reported that she could complete all activities of daily living independently. AR 333-335.

On examination, Dr. Swanson noted that Plaintiff's appearance reflected excellent concern for her personal hygiene. Other than scarring on her left wrist from where she has cut herself and her pregnancy, there was nothing remarkable about her physical appearance. She was fully oriented to person, time, place and situation and was friendly and cooperative. Plaintiff exhibited a full range of affect that varied with her speech content. Her mood was euthymic to euphoric. Plaintiff reported feeling "in between sad and I don't know what I'm going to do" and indicated that she felt "pretty good" most days. Vegetative signs of depression were absent. Short term, recent and remote memories were normal, concentration was adequate for simple mathematical calculations. Judgment and insight were intact. Plaintiff maintained satisfactory attention and concentration throughout the testing. AR 335-336. Testing revealed that Plaintiff was in the borderline intellectual functioning classification and her test results placed her in the eighth percentile. AR 337.

Dr. Swanson did not make an Axis I diagnosis. As to Axis II, he diagnosed borderline intellectual functioning, rule out borderline personality disorder. Her GAF was 70. He noted that her intelligence score was consistent with her clinical presentation. Her mental and emotional functioning were within normal limits. He opined that she could maintain concentration or relate appropriately to others in a job setting. Plaintiff could understand, carry out and remember simple instructions and respond appropriately to usual work situations such as attendance and safety. She could handle funds in her own best interest. AR 338.

On November 30, 2007, Plaintiff told her therapist that she was sad and tired of the baby crying. Plaintiff was also behind on her homework. Plaintiff's therapist assisted Plaintiff with

making a schedule so that she could complete her homework between the baby's feedings and naps. AR 389.

On December 19, 2007, Plaintiff reported that she was feeling better and that home schooling was going well. AR 385.

During therapy on March 17, 2008, Plaintiff's mood and affect were dysphoric and tearful. She was having problems with her relationship but did not want to discuss it. AR 373.

Plaintiff attended therapy on April 3, 2008, and reported continuing relationship problems and poor problem solving and coping skills. The therapist noted that Plaintiff's early childhood traumatic incidents have influenced her current attitudes, expectations and choices. Plaintiff demonstrates poor choices, feelings of being victimized, poor self-care, self-isolation and numbing emotions. Plaintiff stated that she needed to be hospitalized so she can be looked after. AR 370.

On April 23, 2008, Plaintiff rated her depression as a ten out of ten and reported chronic daily suicidal ideations and constant anxiety. Her mood was depressed and insight and judgment were poor. Plaintiff's affect was constricted and her thoughts were suicidal. AR 451-452.

On April 29, 2008, Plaintiff was seen at Crisis Intervention Services after Fresno Police were dispatched to a report of a suicidal female with a knife. Plaintiff reported that she was just upset and that she wasn't going to kill herself. She was discharged the same day. AR 440, 442.

On May 15, 2008, State Agency physician Evangeline Murillo, M.D., completed a case analysis and affirmed the prior finding that Plaintiff could perform simple, repetitive tasks. AR 394-395.

On June 20, 2008, Plaintiff reported feeling more depressed since she broke up with her boyfriend. She felt rejected, disappointed, hopeless and saw no need to continue living. She denied any plan to kill herself but would rather not live anymore. She has not been to all of her sessions because she has not had transportation. On examination, her mood was depressed and her thought content was "normal, suicidal." Judgment and insight were poor and her affect was constricted. Jabeen Hayat, M.D., diagnosed Plaintiff with major depressive disorder, recurrent, severe-no psychosis and chronic/delayed PTSD. AR 419-420.

Plaintiff cancelled her appointment on August 7, 2008, because she could not afford gas and was now working. AR 423.

Plaintiff was seen in therapy on August 21, 2008. She was depressed because of multiple environmental stressors and wept continuously during the session. Plaintiff did not meet the inpatient criteria. AR 419.

Plaintiff's therapist visited her at her grandmother's home on August 28, 2008. Plaintiff was depressed because she was homeless, though she felt a little relief knowing she was on the low income housing waiting list. AR 416.

On August 30, 2008, Fresno Police were called to Ms. Williams' home after Plaintiff made a suicidal gesture by cutting her left wrist, causing significant bleeding. When the officer arrived, Plaintiff had a knife to her left wrist, which was cut and bleeding. Plaintiff was upset over a recent break-up with her boyfriend and wanted to kill herself. While being assessed, Plaintiff stated that she no longer felt suicidal but that she had a lot of stressors in her life. AR 412.

On August 31, 2008, Plaintiff's thoughts were goal directed and focused, and she presented with hope and a plan to make her and her son's life better. She denied suicidal ideations. AR 404.

On September 5, 2008, Plaintiff reported that she could not come to her appointment because she had to work. She also reported that she was doing okay. AR 399.

Plaintiff returned to therapy on September 10, 2008. Her mood and affect were dysphoric. Plaintiff broke up with her boyfriend and indicated that her ex-employer had initiated legal proceedings against her for stealing. Plaintiff had a new position now and her employer transported her to her session. AR 398.

ALJ's Findings

The ALJ determined that Plaintiff had the severe impairments of kidney disease, depression and PTSD. Despite these impairments, she retained the residual functional capacity ("RFC") to lift and carry 20 pounds occasionally, 10 pounds frequently, stand and/or walk for a total of six hours and sit for six hours in an eight hour workday. Mentally, Plaintiff would be

limited to simple, routine work.  Plaintiff did not have past relevant work, but based on the VE's testimony, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy.  AR 12-19.

## **SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence.  42 U.S.C. 405 (g).  Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## **REVIEW**

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

The burden is on the claimant to establish disability. <u>Terry v. Sullivan</u>, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. <u>20 C.F.R. §§ 404.1520</u> (a)-(f), 416.920 (a)-(f) (1994). Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of her disability; (2) has an impairment or a combination of impairments that is considered "severe" (kidney disease, depression and PTSD) based on the requirements in the <u>Regulations (20 CFR §§ 416.920(b))</u>; (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) has no past relevant work; but (5) can perform a significant number of jobs in the national economy. AR 12-19.

Here, Plaintiff argues that the ALJ erred in failing to adopt Dr. Duffy's findings that she had moderate limitations in certain areas.

## **DISCUSSION**

Plaintiff contends that although the ALJ adopted Dr. Duffy's ultimate conclusion that she could perform simple, routine work, he failed to give effect to the related findings that Plaintiff was moderately limited in certain areas of mental functioning. Specifically, Plaintiff points to Dr. Duffy's findings that she was moderately limited in her ability to (1) understand, remember and carry out detailed instructions, (2) perform activities within a schedule, maintain regular attendance and be punctual, (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace, (4) get along with coworkers or peers, and (5) respond appropriately to changes in the work setting. AR 244-245. Plaintiff believes that because the VE testified that a person with occasional[3] problems

---

[3] In concluding that moderate "is sometimes permissibly viewed as equating to an occasional impairment," Plaintiff cites *Morales v. Apfel*, 225 F.3d 310, 314 n. 4 (3d Cir. 2000). Opening Brief, 11. The Court need not determine whether this is an accurate translation because it is not relevant to the analysis.

12

maintaining attention, concentration and pace could not perform any work, she should have been found disabled.

RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of eight hours a day, for five days a week, or equivalent work schedule. SSR 96-8p. The RFC assessment considers only functional limitations and restrictions which result from an individual's medically determinable impairment or combination of impairments. SSR 96-8p. "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Social Security Admin.*, 466 F.3d 880, 883 (9th Cir.2006).

Plaintiff's argument ignores a fundamental tenet of the social security evaluation process. A claimant's RFC is the most a claimant *can still do despite* his or her limitations. 20 C.F.R. § 404.1545(a)(1). Indeed, claimants will have limitations, but in a majority of instances, they will retain the ability to perform some tasks. The RFC determination therefore assumes the existence of limitations. Here, then, although Plaintiff had moderate limitations in certain areas, Dr. Duffy determined that *despite* these limitations, she could (1) understand, remember and carry out simple instructions, (2) maintain concentration, persistence and pace for the duration of a normal workday/workweek, (3) relate appropriately to the public, peers and supervisors, and (4) respond appropriately to usual work situations and adapt. AR 246. Plaintiff makes no argument that the medical record does not support such a finding, though the Court notes that it is consistent with the opinions of both Dr. Swanson and State Agency physician Murillo.

The Ninth Circuit has also rejected Plaintiff's argument. In *Stubbs-Danielson v. Astrue,* 539 F.3d 1169, 1174 (9th Cir. 2008), the claimant argued that the ALJ's RFC for simple, routine, repetitive work failed to capture a moderate limitation in the ability to perform at a consistent pace. Even though the VE testified that anything more than a mild limitation with respect to pace would preclude employment, the ALJ rejected this conclusion, in part, because it

did not address the claimant's RFC. In concluding that the ALJ's RFC properly incorporated the limitations regarding attention, concentration and adaptation, the Court explained:

> The ALJ translated Stubbs-Danielson's condition, including the pace and mental limitations, into the only concrete restrictions available to him-Dr. Eather's recommended restriction to "simple tasks." This does not, as Stubbs-Danielson contends, constitute a rejection of Dr. McCollum's opinion. Dr. Eather's assessment is consistent with Dr. McCollum's 2005 MRFCA, which found Stubbs-Danielson is "not significantly limited" in her ability to "carry out very short simple instructions," "maintain attention and concentration for extended periods," and "sustain an ordinary routine without special supervision." As two of our sister circuits have recognized, an ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony. *See Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir.2001) (where state psychologist both identified claimant as having deficiencies of concentration, persistence or pace and pronounced claimant possessed the ability to "sustain sufficient concentration and attention to perform at least simple, repetitive, and routine cognitive activity without severe restriction of function," ALJ's hypothetical including ability to perform "simple, routine, repetitive tasks" adequately, captured claimant's deficiencies in concentration persistence or pace); *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir.2001) (where ALJ's hypothetical incorporated concrete restrictions identified by examining psychiatrist regarding quotas, complexity, and stress, ALJ did not err in failing to include that claimant suffered from deficiencies in concentration, persistence, or pace).
>
> The Eighth Circuit's decision in *Howard* is directly on point. There, the court explicitly rejected a claim that an ALJ's hypothetical describing an ability to do "simple, routine, repetitive work" failed to capture deficiencies in concentration, persistence, or pace. The court noted the state psychologist's findings which concluded that the claimant, despite certain pace deficiencies, retained the ability to do simple, repetitive, routine tasks. *See Howard*, 255 F.3d at 582. The medical evidence by Dr. Eather in the present case reflects the same conclusion.

539 F.3d at 1174.

Based on this Circuit's precedent, then, the ALJ did not err by finding that Plaintiff was capable of simple, routine tasks despite moderate limitations in certain areas. Nor was the ALJ required to explain why he rejected the limitations, as Plaintiff's suggests, because the limitations were accounted for in the RFC. Moreover, as also set forth in *Stubbs-Danielson*, the ALJ was not required to accept the VE's testimony that a claimant with occasional problems maintaining attention, concentration and pace could not perform any work. This hypothetical was not set forth in terms of an RFC determination and did not reflect Plaintiff's capabilities.

Plaintiff counters this precedent by questioning the "danger of permitting experts to venture into areas beyond their expertise." Opening Brief, 11. To combat this "danger," Plaintiff submits that the VE's testimony that a person with occasional problems maintaining attention,

14

concentration and pace could not work should be adopted, "despite Dr. Duffy's belief that such impairments are tolerable by employers." Opening Brief, 11-12. Whatever Plaintiff's perception of the "danger," it does not change the law under which this Court evaluates the ALJ's findings.

Insofar as Plaintiff contends that she cannot perform the positions identified by the VE because her intellectual functioning is below that required of the positions, her argument fails. Plaintiff points to Dr. Swanson's finding that Plaintiff's test results indicate that her intellectual functioning is "equal to or better than eight percent of individuals the same age." AR 337. Dr. Swanson, however, ultimately determined that Plaintiff could maintain concentration or relate appropriately to others in a job setting, understand, carry out and remember simple instructions and respond appropriately to usual work situations. AR 338. Plaintiff presents no authority to suggest that an intelligence percentile rank undermines the physician's ultimate conclusion.

The ALJ's RFC determination is supported by substantial evidence and free of legal error.

## **CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff, Michelle Smith.

IT IS SO ORDERED.

Dated:   **June 15, 2010**                                **/s/ Dennis L. Beck**
                                                                  UNITED STATES MAGISTRATE JUDGE